823 P.2d 905

Frank W. MONTOYA, Jr., Plaintiff–
Appellant and Cross–Appellee,

v.

**Group One:**

Manuel M. TORRES, Individually, Manuel M. Torres, as Personal Representative of the Estate of Margaret O. Montoya, a/k/a Margarita Vigil Montoya, Erlinda Vigil, Margaret Vigil, Margaret O. Vigil and Margarita O. Vigil Montoya, Deceased, Josephine Vigil Zamora and Antonio Vigil, Jr., Defendants–Appellees and Cross–Appellants.

No. 19656.

Supreme Court of New Mexico.

Dec. 31, 1991.

Popejoy, Leach, Green, Melkus & Giles, P.C., Thomas L. Popejoy, Albuquerque, for plaintiff-appellant and cross-appellee.

William N. Henderson, Albuquerque, for defendant-appellee and cross-appellant Torres.

Hannett, Hannett & Cornish, P.A., George Foster Hannett, Albuquerque, for defendants-appellees and cross-appellants Zamora and Vigil.

## OPINION

FROST, Justice.

This action to quiet title to real property located in Bernalillo County, New Mexico, was brought by Frank W. Montoya, Jr. (Frank Jr.) against the estate of his grandfather's wife, Margaret Vigil Montoya, her three children, and various other relatives of Margaret. The case involves the effect of a presumption of undue influence on the validity of the quitclaim deed given to Frank Jr. by Margaret and her husband, Max Emiliano Montoya, who was Frank Jr.'s maternal grandfather with whom he had "a very special relationship ... closer than the average grandfather-grandson." At trial, defendants challenged the deed

and its effectiveness to convey title, alleging undue influence and Margaret's lack of mental capacity to execute the deed. Margaret's children counterclaimed to set aside the deed and the "Statement Regarding Gifts To Take Effect At Death," executed concurrently with the deed, and to quiet title in them. After a bench trial, final judgment was entered in favor of defendants. We affirm.

FACTS

The findings of fact entered by the district court may be summarized as follows. Margaret and Max were married in May 1977. From the Spring of 1977 until July 1981, Frank Jr. visited Max and Margaret weekly and on special occasions. Margaret would give Frank Jr. small amounts of money periodically. In August 1981, Frank Jr. left New Mexico to attend dental school in Kansas and saw Margaret five or six times before her death in 1986, and only twice after September 1982—a period while she was either in the hospital or a rest home.

At the time of the marriage, Margaret owned the subject property as her separate property, in addition to interests in six other properties and various bank accounts. Max had little or no separate property. During the marriage, Margaret converted her bank accounts from single to joint tenancy accounts with Max into which each deposited their separate retirement incomes and Margaret's rental income. In September 1981, Margaret and Max lived in the residence located on the subject property, which had been remodeled in late 1979 to early 1981 at a cost of between $15,500.00 and $24,000.00 and paid for from a joint bank account.

In August 1981, Frank Jr.'s mother arranged for Max and Margaret to meet with attorney Westerfield for the purpose of executing documents to convey the subject property to Frank Jr. Neither Margaret nor Max knew Westerfield. Previously, Margaret had been represented by an attorney "for many years" and currently was represented by another attorney in an unrelated matter. Frank Jr.'s father and mother drove Max and Margaret to Westerfield's office on September 4th and remained in his private office throughout the meeting, although Frank Jr.'s mother and father were "out of earshot of the conversations." Westerfield was informed by Max or Margaret in the presence of the other that they wanted to give the subject property to Frank Jr. "right then and there," despite the court's finding that an immediate gift of this property would leave Margaret without a home and impoverished unless she sold the balance of her separate property. On the date Margaret and Max met the attorney, the subject property was still the separate property of Margaret; however, in November 1981, she executed a warranty deed conveying the property to herself and Max as joint tenants—a deed not prepared by Westerfield. Margaret never notified her children of this conveyance.

Westerfield discussed with Margaret and Max the issues of their living on the property until the death of the surviving spouse and retaining a right to dispose of the property in the case of need. To this end, he subsequently drafted a "Statement Regarding Gifts To Take Effect At Death" (statement) and a quitclaim deed and mailed the documents to Frank Jr.'s father with instruction to have Margaret and Max review them. All correspondence from Westerfield to Max and Margaret concerning the gift was routed through Frank Jr.'s father. On October 12, 1981, Margaret and Max met with Westerfield alone and executed the statement and deed in his presence.

Margaret and Max instructed Westerfield to inform Frank Jr. of their actions and obtain his approval of the statement before Westerfield recorded the documents at the appropriate times. The court found that "Westerfield would not return the documents to Margaret and Max without Frank [Jr.'s] approval even if Margaret and/or Max had requested return of the documents." Frank Jr. signed the statement on November 5, 1981, thereby accepting the conveyance. Margaret told no one about executing the documents or that she had given the property to Frank Jr. She

never referred to Frank Jr. as the owner of the property or mentioned deep affection for Frank Jr. to her close friends or family members. The execution of the statement and quitclaim deed was disclosed only to Frank Jr. and his parents.

Although Frank Jr. did not personally participate in the procurement of the deed and statement, his parents and grandfather participated substantially in the events surrounding the conveyance. Max and Frank Jr.'s parents all had an opportunity to exercise undue influence on Margaret although Frank Jr. did not personally exercise undue influence over her. Margaret was eighty-three years old at the time of the conveyance and in a weakened mental condition since at least 1977. She "had progressive and advanced arteriosclerosis of the brain with an associated mental defect and displayed a wandering mind, inability to concentrate and progressive loss of memory." Her regular physician opined that she "did not have the capacity to make a valid disposition of her property" at this time, although Westerfield believed she was competent to do so.

Margaret was hospitalized in August 1982 and found by the court, in October 1982, to be without the mental capacity to manage her personal affairs, property, and finances. Her son, defendant Manuel Torres, was appointed her guardian and conservator. Not until February 1984 were Margaret's relatives made aware of the quitclaim deed and statement, when Westerfield recorded the statement. In March, Westerfield sent copies of the recorded statement and unrecorded quitclaim deed to Max in care of Frank Jr.'s mother. Copies were not sent to Margaret or her guardian and conservator. During this time, Max was terminally ill and died in April. In August, Margaret's conservator executed a revocation of the statement, although the basis was inconsistent with the reasons Westerfield had given Margaret and Max for retaining the power to dispose of the property since Margaret was not in need of funds that would require sale of the property. Margaret died intestate on May 12, 1986. Westerfield recorded the quitclaim deed four days later.

At the time Margaret executed the documents there was a confidential relationship between Frank Jr. and Margaret by reason of his grandfather's marriage to her, his parents arranging the initial appointment with Westerfield, transporting Margaret and Max to his office, and remaining in the room during their discussions with Westerfield, and Margaret never having met with Westerfield alone. The court found that the gift to Frank, Jr. was not natural, that he gave no consideration for the transfer, and that the value of the gift was greatly disproportionate to what Margaret's children and grandchildren would receive if the balance of her estate were divided evenly among them. The findings stated that a normal distribution would be to a spouse, children, or other blood heirs and that gifts with a value of the subject property to step-relatives when compared to the size of Margaret's estate were unusual especially based on the relatively short and limited relationship between Margaret and Frank Jr.

Based upon the evidence and the findings of fact, the district court concluded that, although Margaret and Max were competent and had the capacity to understand the nature and effect of the transaction when they executed the quitclaim deed and statement, the gift was invalid due to the existence of a presumption of undue influence over Margaret in the execution of the documents. The presumption was based upon the confidential relationship between Margaret and Max and Frank Jr.'s parents, their participation in the transaction, Margaret's weakened mental condition, the lack of consideration by Frank Jr., the unnatural character of the disposition, and the concealment and failure to disclose the gift to Margaret's children, other relatives or close friends. After concluding that Frank Jr. failed to overcome the presumption of undue influence, the court quieted title in defendants and permitted recovery of their costs.

On appeal, Frank Jr. raises issues concerning whether the presumption of undue influence applied to him, whether he successfully rebutted the presumption, and

whether the district court's findings of fact concerning the confidential relationship between Frank Jr. and Margaret and the unnatural character and value of the gift were supported by the evidence. Defendants filed a cross-appeal, which concerned the findings entered on Margaret's intent to convey a present interest and delivery of the deed. Due to our disposition, however, it is unnecessary to address those issues raised by the cross-appeal.

 In considering the evidence, we view it in a light most favorable to the prevailing party and disregard any inferences and evidence to the contrary. *In re Will of Ferrill,* 97 N.M. 383, 387, 640 P.2d 489, 493 (Ct.App.1981), *cert. quashed,* 98 N.M. 51, 644 P.2d 1040 (1982). We are mindful that the clear and convincing standard of proof is applicable to cases concerning undue influence. *See Roybal v. Morris,* 100 N.M. 305, 310, 669 P.2d 1100, 1105 (Ct.App.1983). This standard requires the fact finder to reach an abiding conviction as to the truth of the facts found. *See Duke City Lumber Co. v. Terrel,* 88 N.M. 299, 301, 540 P.2d 229, 231 (1975); *State ex rel. Dep't of Human Servs. v. Williams,* 108 N.M. 332, 334, 772 P.2d 366, 368 (Ct. App.), *cert. denied,* 108 N.M. 273, 771 P.2d 981 (1989).

## SUSCEPTIBILITY

 First, Frank Jr. argues the district court's failure to make a finding of susceptibility by Margaret made it error to conclude there was undue influence, especially in light of the court's refusal of defendants' proposed finding that "she was susceptible to being influenced by others." At oral argument, however, Frank Jr. conceded that susceptibility is not required as proof of undue influence in all cases. "[A] presumption of undue influence ordinarily is based on evidence of mental weakness *or* susceptibility to influence." *In re Estate of Gonzales,* 108 N.M. 583, 586, 775 P.2d 1300, 1303 (Ct.App.1988), *cert. quashed,* 108 N.M. 197, 769 P.2d 731 (1989) (emphasis added).

The finding on Margaret's mental weakness is supported by the testimony of Margaret's physician of thirty years. He testified that, when Margaret came to him in 1977 for a premarital examination before marrying Max, "it was obvious that she had deteriorated mentally, and ... that she wasn't qualified to know exactly what she [was] getting into." The doctor believed that from 1977 to June 1981 Margaret "had significantly deteriorated mentally ... [p]articularly her poor memory and her inappropriate answers." The doctor further opined that "her disease advanced to points where I did not think she was capable of making a rational decision" and that in 1981 "she could be easily influenced by other people."

## ROLE OF BENEFICIARY

 Frank Jr. also asserts the district court erred in basing its conclusion of undue influence upon the actions of third-person nonbeneficiaries. Relying upon numerous New Mexico cases, Frank Jr. maintains that the beneficiary of a gift must be the one found to have exerted any undue influence. While the primary beneficiary in those cases may have been the party found to have exerted undue influence upon the donor, to accept Frank Jr.'s argument would be wholly inconsistent with the rationale behind the presumption of undue influence. "The law will not permit improper influences to control the disposition of a person's property." *In re Will of Ferrill,* 97 N.M. at 399, 640 P.2d at 505 (Sutin, J., specially concurring). Frank Jr. also relies on cases from other jurisdictions, which we do not consider determinative in light of the New Mexico case law.

 It is immaterial whether undue influence is exercised directly or indirectly. *Brown v. Cobb,* 53 N.M. 169, 172, 204 P.2d 264, 266 (1949). In determining whether undue influence is present, a central focus is on the means used and the effect upon the donor. *See McElhinney v. Kelly,* 67 N.M. 399, 404, 356 P.2d 113, 116 (1960) ("It is not the nature and extent of the influence, but its effect upon the mind of the

testator which determines whether it is undue influence.") (quoting 1 William J. Bowe & Douglas H.Parker, *Page on Wills* § 15.6 at 724); *In re Estate of Gonzales*, 108 N.M. at 586, 775 P.2d at 1303 (ultimate issue is effect of influence on donor). The underlying theory of the doctrine is that the donor is induced by various means to execute an instrument that, in reality, is the will of another substituted for that of the donor. *In re Will of Ferrill*, 97 N.M. at 398, 640 P.2d at 504 (Sutin, J., specially concurring). We specifically reject the contention that a beneficiary must be the one who exerts the undue influence.

## BURDENS OF PROOF AND PERSUASION

■ Frank Jr. asserts that the evidence presented on the issue of undue influence failed to satisfy the required quantum of proof by clear and convincing evidence. In addition, he submits that the court erred in its ruling because the evidence failed to show any unfair or improper conduct on the part of Frank Jr.'s grandfather and parents or that they personally benefitted from the gift. Frank Jr. also claims a lack of evidence on the issue of whether Margaret was dominated by Frank Jr.'s grandfather and parents, and that the findings on the confidential relationship between Margaret and Frank Jr.'s grandfather and parents, lack of consideration, unnatural disposition, participation in the transaction by Frank Jr.'s grandfather and parents, and Margaret's failure to disclose the gift are insufficient to create a presumption of undue influence.

■ We disagree with Frank Jr.'s assessment that he successfully presented evidence to rebut the presumption. A presumption of undue influence is a presumption of fact, not a presumption of law, *McElhinney*, 67 N.M. at 404, 356 P.2d at 116, and, as such, its existence is determined from the facts and circumstances of each particular case. *Galvan v. Miller*, 79 N.M. 540, 546, 445 P.2d 961, 967 (1968).

Generally, because of the difficulty in obtaining direct proof in cases where undue influence is alleged, proof sufficient to raise the presumption is inferred from the circumstances. *See In re Will of Ferrill*, 97 N.M. at 387, 640 P.2d at 493. This concept indicates how sensitively the doctrine of undue influence operates. *Id.* at 399, 640 P.2d at 505 (Sutin, J., specially concurring).

■ The presumption arises if a confidential or fiduciary relation with a donor is shown together with suspicious circumstances. *In re Estate of Gonzales*, 108 N.M. at 585, 775 P.2d at 1302. A confidential or fiduciary relation exists whenever trust and confidence is reposed by one person in the integrity and fidelity of another. *In re Will of Ferrill*, 97 N.M. at 387, 640 P.2d at 493. Some circumstances found to be suspicious in undue influence cases are (1) old age and weakened physical or mental condition of testator; (2) lack of consideration for the bequest; (3) unnatural or unjust disposition of the property; (4) participation of beneficiary in procuring the gift; (5) domination or control over the donor by a beneficiary; and (6) secrecy, concealment, or failure to disclose the gift by a beneficiary. *Hummer v. Betenbough*, 75 N.M. 274, 281, 404 P.2d 110, 115–16 (1965); *Roybal v. Morris*, 100 N.M. 305, 310, 669 P.2d 1100, 1105 (Ct.App.1983); *In re Will of Ferrill*, 97 N.M. at 387–88, 640 P.2d at 493–94. In making its determination the court must answer the question of whether the donor would have made the gift but for the undue influence exerted over him or her. *Galvan v. Miller*, 79 N.M. at 544, 445 P.2d at 965.

■ To create a presumption the party contesting an instrument has the initial burden of establishing a prima facie case of undue influence. Once this initial burden has been met, the party against whom the presumption would operate has an opportunity to present evidence in opposition to the prima facie proof. *In re Estate of Gonzales*, 108 N.M. at 585, 775 P.2d

at 1302; [1] *see* SCRA 1986, 11–301 [2] ("a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption"). This Court, in *Mortgage Investment Co. of El Paso v. Griego*, 108 N.M. 240, 243–44, 771 P.2d 173, 176–77 (1989), stated that when the burden shifts that party must only present evidence to meet or rebut the presumption, not carry the burden of persuasion on the existence of the presumed fact. *Accord In re Estate of Foster*, 102 N.M. 707, 710, 699 P.2d 638, 641 (Ct.App.), *cert. denied*, 102 N.M. 734, 700 P.2d 197 (1985) (burden of persuasion does not shift but remains with party alleging undue influence).

▬ Evidence sufficient to rebut the presumption must at least balance the prima facie showing of undue influence. *Galvan v. Miller*, 79 N.M. at 546, 445 P.2d at 967. If sufficient evidence is not presented to rebut the presumption, the fact finder may find the presumption of undue influence established. Under our rule of evidence on presumptions, SCRA 1986, 11–301, an inference may operate in an evidentiary sense after introduction of contrary evidence and may sufficiently influence the fact finder to conclude that the presumed fact exists. *In re Estate of Padilla*, 97 N.M. 508, 511, 641 P.2d 539, 542 (Ct.App. 1982).

In the present case, Margaret's children had the burdens of proof and persuasion on their allegation that Margaret was subjected to undue influence in the execution of the quitclaim deed to Frank Jr. Our review of the record shows that their burdens were satisfied, and that the court was correct in finding the presumption had been established. Frank Jr.'s attempt to rebut the presumption was unsuccessful. Frank Jr.'s argument that he rebutted the presumption as a matter of law must fail in light of substantial evidence in support of the court's abiding conviction that Margaret was subjected to undue influence.

SUBSTANTIAL EVIDENCE ISSUES

First, on the finding of a confidential relationship between Margaret and Frank Jr.'s grandfather and parents, the evidence reveals that Margaret placed trust and reliance in these persons to assist her in executing the documents to transfer the property to Frank Jr. The evidence shows Margaret entrusted Frank Jr.'s parents with her business affairs and depended upon them for assistance and advice. Second, each suspicious circumstance found by the district court was supported by the evidence in the record. Alone, the lack of consideration may not be a suspicious circumstance, but when considered together with (1) the fact that Margaret never mentioned to close friends or family any affection for Frank Jr. and her intent to give him the property, and (2) the short and limited nature of their relationship, the district court properly could characterize the lack of consideration as suspicious in this instance.

The evidence further revealed that Margaret had close and affectionate relationships with her three children and that before and during her marriage to Max she expressed an intention to leave the subject property to her son Manuel. This evidence suggests that the gift to Frank Jr. may have been inconsistent with Margaret's previously expressed intention regarding disposition of the property. The subject property adjoined other tracts of property

---

1. *Gonzales* dealt with the presumption of undue influence in a will contest and involved an interpretation of NMSA 1978, Section 45–3–407 (Repl.Pamp.1989), which is a part of our probate code relating to formal testacy proceedings. The principles involved in the application of the presumption of undue influence are identical with regard to both wills and deeds.

2. The disappearance of a presumption upon the presentation of contrary evidence was eliminated in 1973 when the rules of evidence were adopted. *Trujillo v. Chavez*, 93 N.M. 626, 629, 603 P.2d 736, 739 (Ct.App.1979). In 1980, the rule was amended to eliminate the shift in the burden of persuasion. *Benham v. All Seasons Child Care, Inc.*, 101 N.M. 636, 639, 686 P.2d 978, 981 (Ct.App.), *cert. denied*, 101 N.M. 686, 687 P.2d 743 (1984). The "bursting bubble" theory, under which a presumption vanished upon the introduction of evidence supporting a finding of the nonexistence of the presumed fact, even though not believed, was rejected. *Id.* at 638–39, 686 P.2d at 980–81.

that Margaret co-owned with her children and that had been in the family for forty years. Moreover, Frank Jr. testified that he never visited Margaret during the two years she lived beyond Max's death in 1984. The record contains sufficient support for the finding on the unnatural character of the conveyance to Frank Jr. and warrants the conclusion that the gift was unusual in light of the circumstances. Finally, the evidence on concealment of the transaction and the participation by Frank Jr.'s grandfather and parents overwhelmingly supports the suspicious nature of the transaction. The proximity of the subject property to adjoining parcels co-owned by family members and the length of time of family ownership reasonably suggests it is likely that a conveyance to a nonfamily member would have been discovered.

Frank Jr.'s specific challenges to findings of fact numbers 20 and 22 concerning the confidential relationship between Margaret and Frank Jr.'s grandfather and parents and the unnatural character of the gift have been considered above. Although the evidence may not have been substantial to support finding number 27 concerning a value attached to the subject property, we deem any error in this regard to be harmless. *See Jewell v. Seidenberg*, 82 N.M. 120, 124, 477 P.2d 296, 300 (1970) (supreme court does not correct harmless error). The refusal by the court to accept any of Frank Jr.'s requested findings of fact is regarded on appeal as a finding against the party. *See Pucci Distrib. Co. v. Nellos*, 110 N.M. 374, 376, 796 P.2d 595, 597 (1990).

Based upon the above, the district court properly could have reached an abiding conviction as to the truth of the facts found. Accordingly, the judgment of the district court is affirmed in its entirety.

IT IS SO ORDERED.

RANSOM, C.J., and MONTGOMERY, J., concur.